UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JOHN ANTHONY CASTRO              :
                    Plaintiffs     :
                               :
          vs.               : C.A. No. 1:23-cv-00405-JJM-PAS
                               :
SECRETARY OF STATE GREGG AMORE;  :
And DONALD JOHN TRUMP        :
                  Defendants  :

## DEFENDANT DONALD JOHN TRUMP'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(6)

### INTRODUCTION

Plaintiff's Verified Complaint ("Complaint") seeks both declaratory and injunctive relief. As shown below, this request for declaratory and injunctive relief is meritless, and there are multiple avenues for this Court to dismiss the Complaint in its entirety, whether for lack of subject-matter jurisdiction or for failure to state a claim on which relief can be granted.

### STANDARD OF LAW

**A.    Dismissal under FRCP 12(b)(1).**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction challenges a court's authority to hear a matter brought by a complaint. "Facial attacks on a complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [the plaintiff's] complaint are taken as true for purposes of the motion." *Torres-Negron v. J & N Recs., LLC,* 504 F.3d 151, 162 (1st Cir. 2007).

///

**B.     Dismissal under FRCP 12(b)(6).**

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. "An adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). A complaint must be dismissed if it does not state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## LEGAL ARGUMENT

**A.     Plaintiff's Complaint should be dismissed for lack of subject matter jurisdiction under FRCP 12(b)(1).**

This Court should dismiss Plaintiff's Complaint pursuant to FRCP 12(b)(1) for lack of subject matter jurisdiction for four independent reasons: (1) the political question doctrine, (2) the non-self executing nature of the Fourteenth Amendment, (3) lack of standing, and (4) it is not ripe.

### 1.     Plaintiff's Complaint presents a nonjusticiable political question.

Our Constitution commits to Congress and the Electoral College exclusive power to determine presidential qualifications and whether a candidate can serve as President. Courts cannot decide the issue at the heart of this case. Federal courts presented with similar cases challenging the qualifications of presidential candidates have uniformly indicated that they present nonjusticiable political questions reserved for those entities. This Court should do likewise.

Political questions are nonjusticiable and are therefore not cases or controversies. *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007). The United States Supreme Court set out broad categories that should be considered nonjusticiable political questions in *Baker v. Carr*,

369 U.S. 186, 217 (1962):

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; [and 6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Numerous courts have indicated that similar challenges to the qualifications of presidential candidates present nonjusticiable political questions. A spate of lawsuits were filed surrounding the 2008 and 2012 General Elections, either asking state elections officials to ensure the qualifications of Barack Obama and/or John McCain, or challenging their qualifications outright. The Third Circuit, in an order issued during one such challenge, "Berg's lawsuit seemed to present a non-justiciable political question." *See Berg v. Obama*, 586 F.3d 234, 238 (3d Cir. 2009).[1] Multiple district courts also noted that lawsuits challenging presidential qualifications presented nonjusticiable political questions. For example, in *Robinson v. Bowen*, 567 F. Supp. 2d 1144 (N.D. Cal. 2008), a case brought before the 2008 election seeking to remove Senator McCain from the California ballot on grounds that he did not qualify as a "natural-born citizen" within the meaning of Article II of the Constitution, Judge Alsup explained why, even if the plaintiff's lack of standing could be cured, the case was due to be dismissed in its entirety:

---

[1] Some have asserted that the discussions of nonjusticiability in *Berg* and other decisions cited below should be disregarded as *dictum*. They are wrong; at most they are more appropriately viewed as alternative holdings, which are not *dictum. See, e.g., Woods v. Interstate Realty Co.,* 337 U.S. 535, 537 (1949) ("where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*"); *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 346 n.4 (1986) (observing that alternative holdings are not dicta). Moreover, even "[i]f these conclusions were dicta, it does not necessarily follow that they were wrong." *Fouts v. Maryland Cas. Co.*, 30 F.2d 357, 359 (4th Cir. 1929).

It is clear that mechanisms exist under the Twelfth Amendment and 3 U.S.C. § 15 for any challenge to any candidate to be ventilated when electoral votes are counted, and that the Twentieth Amendment provides guidance regarding how to proceed if a president elect shall have failed to qualify. Issues regarding qualifications for president are quintessentially suited to the foregoing process. Arguments concerning qualifications or lack thereof can be laid before the voting public before the election and, once the election is over, can be raised as objections as the electoral votes are counted in Congress. The members of the Senate and the House of Representatives are well qualified to adjudicate any objections to ballots for allegedly unqualified candidates. Therefore, this order holds that the challenge presented by plaintiff is committed under the Constitution to the electors and the legislative branch, at least in the first instance. Judicial review—if any—should occur only after the electoral and Congressional processes have run their course.

*Id.* at 1147.

The opinion in *Grinols v. Electoral College*, No. 2:12–cv–02997–MCE–DAD, 2013 WL 2294885, at *5-7 (E.D. Cal. May 23, 2013),[2] is also highly instructive. *Grinols* dismissed a challenge to President Obama's qualifications as a "natural-born citizen" after finding it presented a nonjusticiable political question and violated the separation of powers because the Constitution expressly entrusted the issue of presidential qualifications and removal from office to the legislative branch.[3] Plaintiff will undoubtedly attempt to distinguish this opinion on grounds that it dealt with a plaintiff seeking removal of a sitting president from office, rather than a challenge to the election of a supposedly disqualified president. But an earlier opinion in

---

[2] Stating that "the Constitution assigns to Congress, and not to federal courts, the responsibility of determining whether a person is qualified to serve as President of the United States. As such, the question presented by Plaintiffs in this case—whether President Obama may legitimately run for office and serve as President—is a political question that the Court may not answer."

[3] *See also Kerchner v. Obama*, 669 F. Supp. 2d 477, 483 n.5 (D.N.J. 2009) (rejecting challenge to President Obama's qualifications because, among other things, the claim was "barred under the 'political question doctrine' as a question demonstrably committed to a coordinate political department."). The court observed that "[t]he Constitution commits the selection of the President to the Electoral College in Article II, Section 1, as amended by the Twelfth Amendment and the Twentieth Amendment, Section 3" and that "[n]one of these provisions evince an intention for judicial reviewability of these political choices." *Id.*

4

*Grinols* refused to grant a temporary restraining order to prevent President Obama's 2012 re-election on the same "birther" theory because "numerous articles and amendments of the Constitution together make clear that the issue of the President's qualifications and his removal from office are textually committed to the legislative branch, and not the Courts." *Grinols v. Electoral Coll.*, No. 12-CV-02997-MCE-DAD, 2013 WL 211135, at *4 (E.D. Cal. Jan. 16, 2013). As a result:

> These various articles and amendments of the Constitution make it clear that the Constitution assigns to Congress, and not the Courts, the responsibility of determining whether a person is qualified to serve as President. As such, the question presented by Plaintiffs in this case—whether President Obama may legitimately run for office and serve as President—is a political question that the Court may not answer. If the Court were to answer that question, the Court would "[interfere] in a political matter that is principally within the dominion of another branch of government." This Court, or any other federal court, cannot reach a decision on the merits of a political question because doing so would ignore the Constitutional limits imposed on the courts. Accordingly, Plaintiffs ask the Court to answer a question the Constitution bars the Court from answering.
> *Id.* (citation omitted).

Similarly, in *Taitz v. Democrat Party of Mississippi*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373 (S.D. Miss. Mar. 31, 2015), another case that sought to have a candidate (President Obama) barred from the 2012 ballot based on the claim that he was not a "natural-born citizen," Judge Wingate's thorough opinion carefully analyzed the application of the political question and related separation of powers doctrines to such challenges. *Id*. at *12-16. Observing that the Twelfth and Twentieth Amendments charged the legislative branch with responsibility for the presidential electoral and qualification process ("[t]hese prerogatives are firmly committed to the legislative branch of our government"), *Taitz* observed that "these matters are entrusted to the care of the United States Congress, not this court" and that the plaintiffs' disqualification claims were therefore nonjusticiable. *Id.*

Multiple state courts have also found that secretaries of state had no such power to

disqualify a presidential candidate from a ballot because of the doctrine of separation of powers. For example, in *Strunk v. New York State Bd. Of Elections*, No. 6500/11, 2012 WL 1205117 (Sup. Ct. Kings County NY Apr. 11, 2012), the court found the Secretary of State did not have the authority to check qualifications because that authority presented a political question and a separation of powers issue. The court stated:

> If a state court were to involve itself in the eligibility of a candidate to hold the office of President, a determination reserved for the Electoral College and Congress, it may involve itself in national political matters for which it is institutionally ill-suited and interfere with the constitutional authority of the Electoral College and Congress.

*Id.* at *12.

The California Court of Appeals' analysis in *Keyes v. Bowen*, 189 Cal.App.4th 647, 660 (2010), is also instructive:

> In any event, the truly absurd result would be to require each state's election official to investigate and determine whether the proffered candidate met eligibility criteria of the United States Constitution, giving each the power to override a party's selection of a presidential candidate. The presidential nominating process is not subject to each of the 50 states' election officials independently deciding whether a presidential nominee is qualified, as this could lead to chaotic results. Were the courts of 50 states at liberty to issue injunctions restricting certification of duly-elected presidential electors, the result could be conflicting rulings and delayed transition of power in derogation of statutory and constitutional deadlines. Any investigation of eligibility is best left to each party, which presumably will conduct the appropriate background check or risk that its nominee's election will be derailed by an objection in Congress, which is authorized to entertain and resolve the validity of objections following the submission of the electoral votes.

*See id.*; *accord, e.g.*, *Jordan v. Secretary of State Sam Reed,* No. 12-2-01763-5, 2012 WL 4739216, at *1 (Wash. Super. Aug. 29, 2012) (rejecting birther claims seeking to exclude President Obama from the Washington ballot; "I conclude that this court lacks subject matter jurisdiction. The primacy of congress to resolve issues of a candidate's qualifications to serve as president is established in the U.S. Constitution….")

Thus, the Constitution vests responsibility for determining whether a presidential

candidate is qualified in the *federal* legislative branch—and only in the *federal* legislative branch—and the courts are barred from encroaching on duties exclusively reserved for the federal legislature. As numerous courts have held, this fact alone is sufficient ground for concluding that legal challenges such as the one currently before this Court must be dismissed pursuant to the political question doctrine and related concepts of separation of powers. Overall, this Court would be on solid legal footing in continuing the longstanding American legal tradition of refusing to encroach on exclusively legislative prerogatives.

> **2.    Section Three is not self-executing when used offensively and requires enforcement mechanisms from Congress.**

Consideration of this case would still be patently improper even if it were not barred by the political question doctrine. Section Three of the Fourteenth Amendment is not self-executing and cannot be applied to support a cause of action seeking judicial relief absent Congressional enactment of a statute authorizing said plaintiff to bring such a cause of action. A recent article by scholars Joshua Blackman and Seth Barrett Tillman summarizes the question of whether Section Three is self-executing as follows:

> In our American constitutional tradition there are two distinct senses of self-execution. First, *as a shield—or a defense*. And second, *as a sword—or a theory of liability or cause of action supporting affirmative relief*. The former is customarily asserted as a defense in an action brought by others; the latter is asserted offensively by an applicant seeking affirmative relief.
>
> For example, when the government sues or prosecutes a person, the defendant can argue that the Constitution prohibits the government's action. In other words, the Constitution is raised *defensively*. In this first sense, the Constitution does not require any further legislation or action by Congress. In these circumstances, the Constitution is, as Baude and Paulsen write, "self-executing."
>
> In the second sense, the Constitution is used *offensively–as a cause of action supporting affirmative relief*. For example, a person goes to court, and sues the government or its officers for damages in relation to a breach of contract or in response to a constitutional tort committed by government actors. As a general matter, to sue the federal government or its officers, a private individual litigant must invoke a federal statutory cause of action. It is not enough to merely allege

some unconstitutional state action in the abstract. [Footnote omitted] Section 1983, including its statutory antecedents, *i.e.*, Second Enforcement Act a/k/a Ku Klux Klan Act of 1871, is the primary modern statute that private individuals use to vindicate constitutional rights when suing state government officers.

Constitutional provisions are not automatically self-executing when used offensively by an applicant seeking affirmative relief. Nor is there any presumption that constitutional provisions are self-executing.

Blackman and Tillman, *Sweeping and Forcing the President Into Section 3: A Response to William Baude and Michael Stokes Paulsen*, at 18-, last accessed October 26, 2023, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4568771. Blackman and Tillman then proceed to thoroughly and comprehensively analyze whether Section Three is self-executing and explain at length why it is not. *See generally id.*

Among the arguments they analyze is the historical treatment of the issue by, among others, Chief Justice Chase, and the Congress of 1870, just two years after the 1868 ratification of the Fourteenth Amendment. One year after ratification, the Chief Justice of the Supreme Court of the United States, riding circuit, ruled that Section Three was not self-executing and that it could only be enforced through specific procedures prescribed by Congress or the United States Constitution. *See In re Griffin*, 11 F.Cas. 7 (C.C.Va 1869). Otherwise, if anyone had tried it at that time, it would have created an immediate and intractable national crisis. There is no contemporaneous record of any outcry or protest about this holding. Instead, Congress almost immediately provided the legislation suggested by the Chief Justice.

In 1870, Congress passed a law, entitled the "Enforcement Act," which allowed federal district attorneys to enforce Section Three. But the Enforcement Act did not give *state* election officials the authority to enforce the Fourteenth Amendment; it gave *federal* district attorneys that authority. Section 3 of the Enforcement Act allowed U.S. district attorneys to seek writs of *quo warranto* from federal courts to remove from office people who were disqualified by Section

Three. Section 14 of the Enforcement Act required the courts to hear such proceedings before "all other cases on the docket." Section 15 provided for separate criminal trials of people who took office in violation of Section Three to take place in the federal courts.

Federal prosecutors immediately started exercising *quo warranto* authority, bringing actions pursuant to that ability. These actions, however, waned after a few years. *See* Amnesty Act of 1872 (removing most disqualifications in the manner provided by Section Three; Pres. Grant Proclamation 208 (suspending *quo warranto* prosecutions)). The Amnesty Act of 1898 completely removed all Section Three disabilities incurred to that date.

Today, there is no implementing legislation that executes Section Three. The original Enforcement Act was codified as 13 Judiciary ch. 3, sec. 563 and later recodified into 28 Judicial Code 41 — but in 1948, Congress repealed 28 USC 41 in its entirety. *See* Act of June 25, 1948, ch. 646, § 39, 62 Stat. 869, 993; see also Act of June 25, 1948, ch. 645, § 2383, 62 Stat. 683, 808. In 2021, legislation was introduced to provide a cause of action to remove individuals from office who were engaged in insurrection or rebellion, but no further action was taken on that bill. *See* H.R. 1405, 117th Cong. 2021. Thus, there is presently no statute authorizing any person to bring actions seeking disqualifications under Section Three of the Fourteenth Amendment.

Chief Justice Chase's order and the subsequent legislative history shows that Section Three is not self-executing unless Congress takes action to make it so and that it does not give secretaries of state the authority to remove a presidential candidate from the ballot. Creating a 51-jurisdiction patchwork of state election laws to enforce Section Three would simply fly in the face of this precedent and constitutional tradition, causing the exact crisis Justice Chase feared.

As other federal courts have recognized, this raises a jurisdictional bar to consideration of Mr. Castro's cookie-cutter lawsuits. *See, e.g., Castro v. Weber*, Case No. 2:23-cv-02172-DAD-

AC (E.D. Cal. Oct. 19, 2023), ECF No. 8 at pp. 2-3 (Magistrate Judge's Findings and Recommendations) ("Because '§3 of the Fourteenth Amendment does not provide any private right of action' there is no federal jurisdiction available."), *citing Rosberg v. Johnson*, No. 8:22-cv-384, 2023 WL 3600895, at *3 (D. Neb. May 23, 2023).

### 3.    Plaintiff lacks standing to bring the instant cause of action.

The U.S. Constitution limits the judicial power of federal courts to actual cases and controversies. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), as revised (May 24, 2016) ("[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (citation and quotation omitted). *See also Hybe Co. v. Does 1-100*, 598 F. Supp. 3d 1005, 1007 (D. Nev. 2022) ("The judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.'") (citation and quotation omitted).

Plaintiff's allegation of an intangible injury fails to meet each of the injury, causation, and redressability triad factors required to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992); *see also California Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1049 (9th Cir. 2023). First, he fails to allege an injury that is sufficiently individual and particularized *to him* to confer standing. Plaintiff claims only to suffer a competitive harm because he purportedly must compete with President Trump. But he fails to plausibly allege that this injures him in any particularized or concrete fashion. He has not identified a single voter who identifies Castro as his or her "second choice" after Donald Trump. And he has proffered no expert or social science evidence that could support the inherently improbable claim that there is a latent Castro movement that would surface, if only Trump was not on the ballot. Ultimately, he alleges only the same, generalized injury as anyone else, and that is insufficient to confer standing.

Second, Plaintiff also fails to allege facts sufficient to establish that it is President Trump,

as opposed to other factors, that is causing his asserted injury. Castro claims to be a candidate in the Rhode Island presidential preference primary. Plaintiff makes no claim–let alone a *plausible* claim–that preventing the secretary of state from including President Trump on the primary ballot materially reduces *his* chances of winning it.

Finally, any injury to the Plaintiff caused by the inclusion of President Trump on the ballot is not redressable by this Court. Plaintiff's claim that he has "competitive injury" standing is misplaced. Generally, cases finding competitive standing in the election law context have been brought by political parties seeking to exclude competing parties and candidates from the general election ballot. *See, e.g.*, *Texas Dem. Party v. Benkiser*, 459 F.3d 582, 586-87 n.4 (5th Cir.2006); *Schulz v. Williams,* 44 F.3d 48, 53 (2d Cir.1994); *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir.1990). But Plaintiff has identified no instance in which competitive injury standing has been extended to a political party's primary election, where the question is not who will win a public office, but rather who will be that party's nominee. Nor has he cited a case in which competitive standing was established in a contest to elect delegates to a national political convention. And certainly, neither Congress nor common law or history support such a proposition.

Nor, in this instance, does common sense. Even if Plaintiff's status as a putative "competitor" serves to distinguish him in some measure from those whose generalized claim to standing derives merely from their status as voters, it does not remedy the standing defects posed by the sheer implausibility—unleavened by any measure of reality—of Plaintiff's claims of injury, causation, and redressability. Plaintiff lacks standing.

### B.    Plaintiffs' Claims Are Not Ripe

A final jurisdictional bar to Plaintiff's claim is that it is not yet ripe. Ripeness, another aspect of justiciability, "has roots in both the Article III case or controversy requirement and

in prudential considerations." *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013) (quoting *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003)). Much as standing doctrine seeks to keep federal courts out of disputes involving conjectural or hypothetical injuries, the Supreme Court has reinforced that ripeness doctrine seeks to prevent the adjudication of claims relating to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). court must wait until a case has "taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952). "Insofar as ripeness is rooted in Article III, we must consider it as part of our assessment of whether we have jurisdiction to hear the lawsuit." *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017). A case is unripe when it is "too speculative whether the problem [the plaintiff] presents will ever need solving." *Texas*, 523 U.S. at 302.

Here, Section 3 of the 14th Amendment on its face makes clear that Plaintiff's claim is unripe. The 14th Amendment prohibits individuals from *holding* office, not from being on the ballot for an office under the United States, being nominated for such office, or being elected to such office. U.S. Const. amend. XIV, § 3. This distinction matters because it speaks directly to when the requirements of Section Three are operative. They are not operative or ripe for challenge until an individual *holds* office; a challenge to ballot access is thus premature.

This distinction makes sense because even if there is a "disability" under Section Three, it may be lifted by a two-thirds vote of each House. *Id.* Thus, even if someone is unquestionably disqualified under Section Three, they may still appear on the ballot and be elected by the people.

12

Whether they are able to "hold" the office depends on whether Congress "remove[s] such disability." *See generally Smith v. Moore*, 90 Ind. 294, 303 (1883) (describing the distinction between restrictions on being *elected* versus *holding* an office and noting, "[u]nder [Section Three] . . . it has been the constant practice of the Congress of the United States since the Rebellion, to admit persons to seats in that body who were ineligible at the date of the election, but whose disabilities had been subsequently removed."); *Privett v. Bickford*, 26 Kan. 52, 58 (1881) (analogizing to Section Three and concluding that voters can vote for an ineligible candidate who can only take office once his disability is legally removed); *Sublett v. Bedwell*, 47 Miss. 266, 274 (1872) ("The practical interpretation put upon [Section Three] has been, that it is a personal disability to 'hold office,' and if that be removed before the term begins, the election is made good, and the person may take the office.").

The Ninth Circuit's opinion in *Schaefer v. Townsend* further illustrates why this is important. 215 F.3d 1031, 1038 (9th Cir. 2000). *Schaefer* evaluated a California law that required candidates for Congress to satisfy a residency requirement at the time he or she filed his or her nomination papers. As in this case, California's law sought to implement a constitutional requirement, the requirement that a member of the House of Representatives be an inhabitant of the state in which he shall be chosen. U.S. CONST. art. I, § 2, cl. 2. Nevertheless, *Schafer* determined that California's law was unconstitutional because it added qualifications that are not found in the Constitution.

Timing was critical in reaching this conclusion. The Constitution provides that an individual must be an inhabitant of the state "when elected." *Id.* "When elected" is not "when nominated" because nonresident candidates could move into the State and "inhabit" it in the period between nomination and election. *Schaefer*, 215 F.3d at 1037.

13

The timing matters. Seeking to prematurely enforce a constitutional limitation effectively imposes an additional qualification on the office of the President, which is not permitted. *See Schaefer*; *see also U.S. Term Limits, Inc.*, 514 U.S. at 802.

Moreover, the fact that the Constitution expressly and exclusively vests Congress with authority to remove a disability (where one exists)—and provides no role for the states or courts to play in this process—buttresses the conclusion that this is not the appropriate time or place for addressing this issue. The text of the Fourteenth Amendment places no limit or restriction on *when* Congress must exercise its authority to remove a disability. Historical practice shows that Congress can and has exercised this authority at different times and in different ways, ranging from general, prospective amnesty to individualized determinations occurring after an individual was elected.

Allowing—let alone *requiring*—states to disqualify candidates at the ballot access stage limits Congress' freedom of action in contravention of the text of the Constitution. If states bar a candidate from the ballot, then Congress never gets the opportunity to play the role expressly and exclusively assigned to it by the Constitution. This is not and cannot be correct. Plaintiff's claim is not ripe and should be dismissed for lack of subject-matter jurisdiction.

**C.    Plaintiff's Complaint should be dismissed for failure to state a claim under FRCP 12(b)(6).**

**1.    Section Three of the Fourteenth Amendment does not apply to President Trump.**

This Court should cease entertaining this action because President Trump is not subject to Section Three. Section Three states:

No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-

14

thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3

First, by its plain terms, Section Three does not explicitly include the President. Section Three specifically references several officials, including members of Congress and members of any State legislature. It does not specifically mention the President. Pursuant to the semantic canon of statutory interpretation *expressio unius est exclusio alterius*, the "expression of one thing implies the exclusion of others" not mentioned. Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012). Since the President is not mentioned, basic canons of statutory interpretation counsel that the President is not included within the scope of Section Three.

To avoid this conclusion, some have looked to the phrase "officers of the United States" as a catch-all to include the President. This argument is unavailing. As that term was used in Section Three, it did not cover the President. Furthermore, Section Three can disqualify someone only if his oath was "to support the Constitution of the United States." *Id*. As explained later, that is not the oath that President Trump took.

 The phrase "Officers of the United States," as used in the Constitution of 1788, does not refer to elected positions. *See* Josh Blackman & Seth Barrett Tillman, *Is the President an "Officer of the United States" for Purposes of Section 3 of the Fourteenth Amendment?*, 15(1) N.Y.U. J.L. & LIBERTY 1 (2021). *That* meaning had not changed by 1868, when the Fourteenth Amendment was ratified. *Id*. In fact, as Blackman and Tillman explain in their later 2023 article:

> Our 2021 article cites several sources from the period roughly contemporaneous with ratification to support the position that the President is not an Officer of the United States. For example, we wrote:
>
> In 1876, the House of Representatives impeached Secretary of War William Belknap. During the trial, Senator Newton Booth from California observed, "the

President is not an officer of the United States." Instead, Booth stated, the President is "part of the Government." Two years later, David McKnight wrote an influential treatise on the American electoral system. He reached a similar conclusion. McKnight wrote that "[i]t is obvious that . . . the President is not regarded as 'an officer of, or under, the United States,' but as one branch of 'the Government.'

Blackman and Tillman, *supra* at 112. They continue:

First, presidents fall under the scope of the Impeachment Clause precisely because there is express language in the clause providing for presidential impeachments; the Impeachment Clause does not rely on general "office"- or "officer"-language to make presidents impeachable. We think this is the common convention with regard to drafting constitutional provisions. When a proscription is meant to control elected positions, those positions are expressly named, as opposed to relying on general "office"- and "officer"-language. Congress does not hide the Commander in Chief in mouseholes or even foxholes. For example, in 1969, future-Chief Justice William H. Rehnquist, then an Executive Branch attorney, addressed this sort of clear-statement principle. Statutes that refer to "officers of the United States," he wrote, generally "are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive." Five years later, future-Justice Antonin Scalia, then also an Executive Branch attorney, reached a similar conclusion with regard to the Constitution's "office"-language. These Executive Branch precedents would counsel against deeming the President an "officer of the United States."

Second, as to the Appointments Clause, which uses "Officers of the United States"-language, Presidents do not appoint themselves or their successors. The Supreme Court hears a never-ending stream of cases that ask if a particular position is a principal or inferior officer of the United States—even though the Appointments Clause does not even distinguish between those two types of positions. Where has the Court ever suggested that the President falls in the ambit of the Appointments Clause's "Officers of the United States"-language?

To the contrary, the Court has asserted just the opposite. In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, Chief Justice Roberts observed that "[t]he people do not vote for the 'Officers of the United States.'" Rather, the Appointments Clause requires appointment of these individuals. Chief Justice Roberts reaffirmed this position in *Seila Law LLC v. CFPB*. He wrote, "Article II distinguishes between two kinds of officers—principal officers (who must be appointed by the President with the advice and consent of the Senate) and inferior officers (whose appointment Congress may vest in the President, courts, or heads of Departments)." Both categories of positions are appointed.

And, finally, as to the Commissions Clause, which also uses "Officers of the United States"-language, Presidents do not commission themselves, their vice presidents, their successor presidents, or successor vice presidents.

16

*Id*. at 116-117. Blackman and Tillman write further about the clauses in Section Three:

> The second clause does not expressly list several categories of positions: *e.g.*, presidential electors, appointed officers of state legislatures, members of state constitutional conventions, and state militia officers. The first clause does not expressly list several categories of positions: *e.g.*, members of the state legislatures, and members of state constitutional conventions. Neither list expressly mentions the President and Vice President.

*Id*. at 126.

Even if this Court were to determine that President Trump was an officer of the United States, Section Three does not, by its terms, apply to all officers of the United States, but rather only to those who have taken "previously taken an oath . . . to support the Constitution of the United States." President Trump did not take the specified oath; instead, the oath President Trump took is that mandated by Article II, Clause Eight of the United States Constitution. That oath states:

> Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:– I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and *will to the best of my Ability, preserve, protect and defend the Constitution of the United States.*

U.S. Const., art. II, cl. 8 (emphasis added).

The words used in the presidential oath differ from those in the oaths other members of the federal and state governments take:

> The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, *to support this Constitution* . . . .

*Id*. at art. VI, cl. 3 (emphasis added).

As noted, Section Three contains the same emphasized phrase:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or

17

under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, *to support the Constitution of the United States* . . .

U.S. Const. amend. XIV, § 3.

Thus, the Constitution requires members of Congress and those appointed to offices under the United States to take an oath to "support" the Constitution, but it requires the President to take an oath to "preserve, protect and defend" the Constitution. This is significant for two reasons. First, it is further evidence that the President was not understood or intended by the drafters of the Fourteenth Amendment to be an Officer of the United States. And second, because having "previously taken an oath . . . to *support* the Constitution of the United States" is a further limitation upon the class of persons subject to Section Three, it excludes President Trump—who never took such an oath—from that class of persons.

Section Three's second clause clearly limits Section Three's application to individuals who had previously taken a particular oath, namely the oath specified in Article VI. Both Section Three and Article VI reference the same groups of people, neither of which encompasses the President. It is therefore unlikely that Section Three would have been understood to apply to the President. The history of how the Constitution's Impeachment Clause was drafted further supports this conclusion. When said clause was drafted, it initially referred to the President, Vice President, and "other civil officers of the U.S." 2 The Records of the Federal Convention of 1787, at 545, 552 (Farrand ed., 1911). But upon further deliberation, the drafters changed the Impeachment Clause to remove the word "other." *Id*. at 600. There would have been no reason to do that if the President were indeed an "officer of the United States."

If the Framers of the Constitution wanted the oath to be the same for the President of the United States as it is for senators, representatives, state legislators, and executive and judicial

18

officers, they would have so spoken. The words that they chose must be given their proper meaning and where they chose different phrases those phrases must be accorded different meanings. *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 4, 334, 4 L. Ed. 97 (1816) ("From this difference of phraseology, perhaps, a difference of constitutional intention may, with propriety, be inferred. It is hardly to be presumed that the variation in the language could have been accidental."). And if the framers of Section Three wanted the President of the United States to be subject to disqualification, they would have so specified. Instead, they used a phrase—officer of the United States—understood not to include the President and further limited the scope of the provision to those officers who had taken the Article VI oath to "support" the Constitution. President Trump was not an officer of the United States and never took the Article VI oath. Section Three therefore does not apply to him.

### 2.    Even if Section Three did apply to President Trump, Plaintiff has not alleged a violation of Section Three.

Plaintiff has not alleged—apart from bare conclusions—that President Trump has violated any provision of Section Three. Nor can he. Assuming Plaintiff's pleadings to be true and construing all reasonable inferences in the light most favorable to him, the Complaint on its face does not assert a cause of action. This Court should thus dismiss this action for failure to state a claim upon which relief can be granted.

### a.    "Insurrection or Rebellion" under Section Three requires treasonous warmaking.

Section Three was modeled partly on the original Constitution's Treason Clause, and partly on the Second Confiscation Act, which Congress had enacted in 1862. Section Two of the Confiscation Act punished anyone who "shall hereafter incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States … or give aid or comfort thereto." 12 Stat. 589 & 627 (1862); *see* 18 U.S.C. § 2383.

19

Section Three, ratified six years later with the rest of the Fourteenth Amendment,
similarly covers "insurrection or rebellion." Unlike the Confiscation Act, however, Section Three
omits any penalty for 'incit[ing] or "assist[ing]" an insurrection, and it penalizes only actually
"engag[ing] in" insurrection.

The year after the Confiscation Act became law, Chief Justice Chase—an appointee of
President Lincoln—construed these terms and held the Act prohibits only conduct that
"amount[s] to treason within the meaning of the Constitution," not any lesser offense. *United
States v. Greathouse*, 26 F. Cas. 18, 21 (C.C.N.D. Cal. 1863). Indeed, the Chief Justice
concluded that not just any form of treason would do: he construed the Section 2 of the Act to
cover only treason that "consist[ed] in engaging in or assisting a rebellion or insurrection." *Id.* In
the same case, another judge confirmed and clarified that, for these purposes, "engaging in a
rebellion and giving it aid and comfort[] amounts to a levying of war," and that insurrection and
treason involve "different penalt[ies]" but are "substantially the same." *Id.* at 25 (Hoffman, J.).
Contemporary dictionaries confirmed this definition. John Bouvier's 1868 legal dictionary
defined *insurrection* as a "rebellion of citizens or subjects of a country against its government,"
and *rebellion* as "taking up arms traitorously against the government." *A Law Dictionary,
Adapted to the Constitution and Laws of the United States of America, and of the Several States
of the American Union* (Philadelphia, G.W. Childs, 12th ed., rev. and enl. 1868).

Congress's immediate post-ratification consideration of Section Three itself reflects the
same understanding. In 1870—just two years after the Fourteenth Amendment was ratified—
Congress considered whether a Representative-elect from Kentucky was disqualified by Section
Three when, before the Civil War began, he had voted in the Kentucky legislature in favor of a
resolution to "resist [any] invasion of the soil of the South at all hazards." 41 Cong. Globe at

5443. The House found that this was not disqualifying. *Id.* at 5447. Similarly, in 1870 the House also considered the qualifications of a Representative-elect from Virginia who, before the Civil War, had voted in the Virginia House of Delegates for a resolution that Virginia should "unite" with "the slaveholding states" if "efforts to reconcile" with the North should fail, and stated in debate that Virginia should "if necessary, fight," but who after Virginia's actual secession "had been an outspoken Union man." *Hinds' Precedents of the House of Representatives of the United States*, 477 (1907). The House found that this was not disqualifying under Section Three. *Id.* at 477-78. By contrast, the House did disqualify a candidate who "had acted as colonel in the rebel army" and "as governor of the rebel State of North Carolina." *Id.* at 481, 486.

The riot that occurred at the Capitol on January 6, 2021, was terrible. But it was not a war upon the United States. The January 6 rioters entered the Capitol, stayed inside for a few hours, and then left. Ultimately, Congress counted the electoral votes early the next morning. Not a single piece of evidence shows that the rioters made war on the United States or tried to overthrow the government. Plaintiff cannot show not a single instance of anyone being shot by the rioters. Plaintiff cannot show a single instance of someone being stabbed by the rioters. The only people who died at the riot and because of the riot were protestors.[4]

Even if all the facts in the Complaint are true, rebellion or insurrection is a federal crime, and no court in the United States has found President Trump guilty of 18 U.S.C. § 2383. To the contrary, the Senate found President Trump not guilty of impeachment charges of insurrection brought by the 117th Congress. *See* Impeaching Donald John Trump, President of the United

---

[4] The sole police officer to die did so of natural causes—a stroke. Williams, Pete, "Capitol Police Officer Biran Sicknick died of natural causes after riot, medical examiner says," NBC News, April 19, 2021, https://www.nbcnews.com/politics/politics-news/capitol-police-officer-brian-sicknick-died-natural-causes-after-riot-n1264562, last visited October 6, 2023.

States, for high crimes and misdemeanors, H. 24, 117th Cong. (2021).[5] No court in the United States has found President Trump guilty under 18 U.S.C. § 2383. Furthermore, not a single prosecutor has filed an indictment against President Trump for rebellion or insurrection, much less obtained a conviction on such a charge. Nor has a single prosecutor charged any of the 1,000+ people connected to the riot at the Capitol under 18 U.S.C. § 2383, the federal criminal statute that covers "insurrection." *United States v. Griffith*, Criminal Action No. 21-244-2 (CKK), 2023 WL 2043223, at *3 fn. 5 (D.D.C. Feb. 16, 2023), (finding that "no defendant has been charged with [18 U.S.C. § 2383]"); *See also*, Alan Feuer, *More Than 1,000 People Have Been Charged in Connection with the Jan. 6 Attack*, N.Y. TIMES (Aug. 1, 2023), https://www.nytimes.com/live/2023/08/01/us/trump-indictment-jan-6#more-than-1000-people-have-been-charged-in-connection-with-the-jan-6-attack. The events of January 6 devolved into a riot that was repugnant to any objective observer. But they were not an "insurrection."

> **b.**   **"Aid or Comfort to the Enem[y]" under Section Three requires assistance to a foreign power.**

The fifth clause of Section Three disqualifies those who have "given aid or comfort to the enemies" of the "United States" or the "Constitution." In this regard, Section Three was not modeled on the Confiscation Act, which criminalized giving "aid or comfort" to a "rebellion or insurrection." Instead, Section Three replicates the language of the original Constitution's Treason Clause, Article III, Section Three, which defines treason as "adhering to [the United States'] Enemies, giving them Aid and Comfort."

It was well known that the "enemies" prong of the Treason Clause almost exactly replicated a British statute defining treason. *See* 4 Blackstone, *Commentaries on the Laws of*

---

[5]   The Senate's not guilty vote can be found at https://www.senate.gov/legislative /LIS/roll_call_votes/vote1171/vote_117_1_00059.htm (last visited on October 6, 2023).

*England* 82 (1769). But "enemies," as used in that statute, referred only to "the subjects of foreign powers with whom we are at open war," not to "fellow subjects." *Id.* at 82-83. Blackstone was emphatic that "an enemy" was "always the subject of some foreign prince, and one who owes no allegiance to the crown of England." *Id.*

Blackstone's view was also the American view. Four years after the original Constitution was ratified, Justice Wilson explained that "enemies" are "the citizens or subjects of foreign princes or states, with whom the United States are at open war." 2 *Collected Works of James Wilson* 1355 (1791). The 1910 version of *Black's Law Dictionary* agrees, defining "enemy" as "either the nation which is at war with another, or a citizen or subject of such nation." At the outset of the Civil War, the Supreme Court had recognized that the Confederate states should be "treated as enemies," under a similar definition of that word, because of their "claim[] to be acknowledged by the world as a sovereign state," and because (although the United States did not recognize that claim) the Confederacy was *de facto* a foreign power that had "made war on" the United States. *See The Prize Cases*, 67 U.S. 635, 673-74 (1862). So, it made sense for Section Three, enacted in response to the Civil War, to refer to support for the Confederacy as "aid and comfort to… enemies," defined as foreign powers in a state of war with the United States. To be disqualified under Section Three, a person must have "engaged" in an insurrection, not merely provided aid or comfort.

        **c.**    **These definitions make clear that President Trumps's alleged conduct does not come within Section Three.**

Even if January 6 was an insurrection (it was not), Plaintiff fails to establish that President Trump "engaged" in insurrection. The Complaint itself is short on details for what exactly President Trump did that Plaintiffs believe constitutes "engaging" in insurrection. To the extent that it does allege conduct, it primarily focuses on the President's speech both before and after the

23

election. This is insufficient to state a claim.

The framers of the Fourteenth Amendment made a deliberate choice that Section Three should cover only actual "engage[ment] in" insurrection or rebellion (or assisting a foreign power), not advocating rebellion or insurrection. As noted above, Congress modeled Section Three partly on the original Constitution's Treason Clause and partly on the Second Confiscation Act (enacted in 1862). The Second Confiscation Act made it a crime to "incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States, or the laws thereof, or . . . give aid or comfort thereto, or . . . engage in, or give aid and comfort to, any such existing rebellion or insurrection." 12 Stat. 589, 627 (1862); *see* 18 U.S.C. § 2383. In other words, it drew distinctions between inciting, assisting, or giving aid or comfort on the one hand and engaging on the other. The plain implication is that they refer to separate and distinct concepts. *See* ANTONIN SCALIA & BRIAN A. GARNER, *supra* ("[A] material variation in terms suggests a variation in meaning.").

The word "engage" connotes active, affirmative involvement. To wit, Black's Law Dictionary defines "engage" to mean "employ or involve oneself; to take part in; to embark on." BLACK'S LAW DICTIONARY (11th ed. 2019). This suggests a significant level of activity, not mere words or inaction.

This textual analysis is supported by the historical context. The same representatives who voted for the Fourteenth Amendment understood that, under its terms, even strident and explicit antebellum advocacy for a future rebellion was not "engaging in insurrection" or providing "aid or comfort to the enem[y]." *See supra* § III(B)(iv)(a) (discussing the post-ratification history of Section Three). Plaintiff's allegations fall well short of how Congress has understood and applied Section Three in practice.

"If the First Amendment protects flag burning, funeral protests, and Nazi parades—despite

the profound offense such spectacles cause—it surely protects political campaign speech despite popular opposition." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (citing *Texas v. Johnson*, 491 U.S. 397 (1989); *Snyder v. Phelps*, 562 U.S. 443 (2011); *Nat'l Socialist Party of Am. v. Skokie*, 432 U.S. 43 (1977) (*per curiam*)). "Indeed, the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco City Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989). Speech on matters of public concern—even controversial or objectionable speech on matters of public concern—is protected by the First Amendment. *See, e.g.*, *Snyder*, 562 U.S. 443.

These basic principles apply, even in the context of Section Three. For example, the Supreme Court considered the Georgia legislature's refusal to seat an elected candidate on the ground that his strident criticisms of the Vietnam War "gave aid and comfort to the enemies of the United States" and were inconsistent with an oath to support the Constitution. *Bond v. Floyd,* 385 U.S. 116, 118–23 (1966). The Court held that the candidate's speech was protected by the First Amendment and could not be grounds for disqualification. *Id.* at 133–37.

Even assuming *arguendo* that incitement or one form or another could qualify as "engaging" under Section Three, speech must clear a very high First Amendment threshold to rise to the level of "incitement." Even "advocacy of the use of force or of law violation" or of "'the duty, necessity, or propriety' of violence" falls short of that threshold. *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969). The "mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002); *Nwanguma v. Trump*, 903 F.3d 604, 610 (6th Cir. 2018). "What is required, to forfeit constitutional protection," is speech that (1) "specifically advocates for listeners to take unlawful action" and (2) is likely to produce "*imminent* disorder"—not merely "illegal action at some indefinite future

time." *Nwanguma*, 903 F.3d at 610 (cleaned up); *Hess v. Indiana*, 414 U.S. 105, 108–09 (1973) (emphasis added). And, as the Court recently underscored in *Counterman v. Colorado*, it requires a showing of "specific intent . . . equivalent to purpose or knowledge." 600 U.S. 66, 81 (2023) (citing *Hess v. Indiana*, 414 U.S. 105, 109 (1973)).

Under the *Brandenburg* test, President Trump's comments did not come close to "incitement," let alone "engagement" in an insurrection. As the Sixth Circuit recognized, "the fact that audience members reacted by using force does not transform . . . protected speech into unprotected speech." *Nwanguma*, 903 F.3d at 610. And, as a D.C. Circuit judge remarked at argument last year, if "you just print out the [President's January 6] speech . . . and read the words … it doesn't look like it would satisfy the [*Brandenburg*] standard." Tr. of Argument at 64:5–7 (Katsas, J.), *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. Dec. 7, 2022).

Plaintiff has not directly alleged any statement attributed to former President Trump that implicitly or explicitly advocated for illegal conduct. President Trump's only explicit instructions called for protesting "peacefully and patriotically," to "support our Capitol Police and law enforcement," to "[s]tay peaceful," and to "remain peaceful." *See The January 6th Report* 117th Cong. 586 (2022) (ECF No. 10-1) (Which records that President Trump ensured to tell the crowd at the Ellipse to protest "peacefully and patriotically"); @realDonaldTrump, Twitter (Jan. 6, 2021, 2:38 PM), https://twitter.com/realDonaldTrump/status/1346904110969315332; @realDonaldTrump, Twitter (Jan. 6, 2021, 3:31 PM), https://twitter.com/realDonaldTrump/status/1346912780700577792. Even had President Trump not expressly called for peace and patriotism rather than violence, the courts have made clear that angry rhetoric falls far short of an implicit call for lawbreaking.

President Trump did not "engage" in an insurrection as a matter of law. Thus, Plaintiffs

fail to state a claim.

## CONCLUSION

For all the foregoing reasons, Plaintiff's Verified Complaint should be dismissed in its entirety, with prejudice, and the instant case closed.

> Respectfully submitted,
> Defendant Donald John Trump,
> By his Attorney,
>
> */s/Gregory P. Piccirilli, Esquire #4582*
> 2 Starline Way #7
> Cranston, RI  02921
> Telephone No.: (401) 578-3340
> Gregory@splawri.com

## CERTIFICATE OF SERVICE

I hereby certify that, on October 26, 2023, I caused the foregoing to be served on parties of record via this Court's Electronic Case Filing system.

> */s/Gregory P. Piccirilli*

27